**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONOPCO, INC. d/b/a UNILEVER, | Case No. _____ |
| *Plaintiff*, | |
| v. | **FILED UNDER SEAL** |
| 2026 THIRD REALTY, LLC, HAE HEE KIM, COURTNEY HAEJIN KIM, DANIEL HUNGSIK KIM, BRYANT KIM, K & K FOOTWEAR, INC., AND JOHN DOES 1-10, inclusive, | |
| *Defendants*. | |

**MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S APPLICATION FOR *EX PARTE*
TEMPORARY RESTRAINING ORDER; ORDER AUTHORIZING
*EX PARTE* SEIZURE; ORDER TO SHOW CAUSE FOR PRELIMINARY
INJUNCTION; AND ORDER ALLOWING EXPEDITED DISCOVERY**

William P. Deni, Jr.
J. Brugh Lower
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Tel: 212-613-2000
Fax: 212-290-2018

Anna Naydonov (*pro hac vice* to be filed)
Mary Kate Brennan
Spencer K. Beall (*pro hac vice* to be filed)
Rosie Norwood-Kelly (*pro hac vice* to be filed)
**FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400

*Attorneys for Plaintiff
Conopco, Inc. d/b/a Unilever*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

I.     STATEMENT OF FACTS ............................................................................ 1

      A.     Unilever's Registered Trademarks .......................................................... 1

      B.     Defendants' Illegal Counterfeiting Activities ......................................... 3

II.     ARGUMENT ............................................................................................... 7

      A.     This Court Should Order an Ex Parte Seizure of All Counterfeit Products Possessed by Defendants and All Relevant Documents, Records, Electronically-Stored Information, and Other Materials at the Locations Described in Unilever's Proposed Order ................................................. 10

             1.     Relief Other Than an Ex Parte Seizure Order Is Inadequate to Achieve the Purposes of Section 1114 ...................................... 10

             2.     Unilever Has Not Publicized the Requested Seizure ............... 11

             3.     Unilever Is Likely to Succeed on its Counterfeiting Claim ..... 11

             4.     Unilever Will Suffer Immediate and Irreparable Injury If the Ex Parte Seizure Order Is Not Granted ........................................ 12

             5.     The Counterfeit Products and Other Specified Materials to Be Seized Are Located at the Places Identified in the Order ......... 14

             6.     The Harm to Unilever and the Consuming Public in Denying the Order Outweighs the Harm to the Interests of Defendants ...... 14

             7.     Defendants, or Others Acting in Concert With Them, Would Destroy, Move, Conceal, Or Otherwise Make Unavailable Evidence If Unilever Were to Proceed on Notice .................... 16

      B.     Unilever is Entitled to a Temporary Restraining Order and Subsequent Preliminary Injunction ............................................................................ 16

             1.     Unilever Is Likely to Succeed on the Merits of Each of its Claims .......... 17

                   a.     Unilever Is Likely to Succeed on the Merits ............... 17

                   b.     Unilever Is Likely to Succeed on the Merits of its Unfair Competition and False Designation of Origin Claim .................. 19

                   c.     Unilever Is Likely to Succeed on the Merits of its New York Unfair Competition Claim ................................... 19

d.      Unilever Is Likely to Succeed on the Merits of Its Federal and New York Dilution Claims ................................................... 20

2.      Unilever Has No Adequate Remedy at Law and, Absent a Preliminary Injunction, Will Suffer Irreparable Harm ........................... 22

3.      The Balance of Hardships Weighs in Unilever's Favor .......................... 23

4.      Threat to Public Health and Safety from the Counterfeit Products Supports the Issuance of a Preliminary Injunction ................................. 24

C.      Unilever's Motion for Expedited Discovery Should Be Granted ....................... 25

1.      Expedited Discovery Is Necessary to Effectuate the Requested Equitable Relief ..................................................................... 26

2.      The Injury to Unilever and the Consuming Public Absent Expedited Discovery Exceeds Any Potential Injury to Defendants ......... 27

D.      Unilever's Request for a Security Bond in the Amount of $5,000 Is Adequate ............................................................................. 27

III.     CONCLUSION .............................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Co. v. Individuals, P'ships, & Unincorporated Ass'ns identified in Schedule "A"*,
   No. 20-CV-2348, 2020 WL 6817650 (D. Minn. Nov. 20, 2020) ...........................................24

*3M Co. v. Performance Supply, LLC*,
   458 F. Supp. 3d 181 (S.D.N.Y. 2020)........................................................................... *passim*

*adMarketplace, Inc. v. Tee Support Inc.*,
   No. 13-CV-5635, 2013 WL 4838854 (S.D.N.Y. Sept. 11, 2013)...........................................26

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
   No. 15-CV-1092, 2015 WL 845711 (S.D.N.Y. Feb. 26, 2015).........................................9, 21

*BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*,
   408 F. Supp. 3d 508 (S.D.N.Y. 2019).................................................................................17

*Burberry Ltd. v. Euro Moda, Inc.*,
   2009 U.S. Dist. LEXIS 53250 (S.D.N.Y. June 10, 2009)......................................................21

*Cengage Learning, Inc. v. Doe 1*,
   No. 18-CV-403, 2018 WL 2244461 (S.D.N.Y. Jan. 17, 2018) ..................................17, 26, 27

*CJ Prods. LLC v. Concord Toys Int'l Inc.*,
   No. 10-CV-5712, 2011 WL 178610 (E.D.N.Y. Jan. 19, 2011) .........................................13, 22

*Coty Inc. v. Excell Brands, LLC*,
   277 F. Supp. 3d 425 (S.D.N.Y. 2017)..................................................................................20

*Deere & Co. v. MTD Prods., Inc.*,
   41 F.3d 39 (2d Cir. 1994).....................................................................................................20

*DigitALB, Sh.a v. Setplex, LLC*,
   284 F. Supp. 3d 547 (S.D.N.Y. 2018)..................................................................................20

*Doctor's Assocs., Inc. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996)....................................................................................................27

*El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986)..................................................................................................22

*Estee Lauder, Inc. v. Watsky*,
   323 F.Supp. 1064 (S.D.N.Y. 1970) ......................................................................................23

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
    696 F.Supp.2d 368 (S.D.N.Y. 2010)................................................................18

*Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*,
    786 F.2d 105 (2d Cir. 1986)......................................................................12

*Gucci Am., Inc. v. Accents*,
    955 F. Supp. 279 (S.D.N.Y. 1997) ............................................................10

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
    286 F. Supp. 2d 284 (S.D.N.Y. 2003).......................................................12

*Gucci Am., Inc. v. Gucci*,
    No. 7-CV-6820, 2009 WL 8531026 (S.D.N.Y. Aug. 5, 2009)..................9

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
    826 F.3d 27 (2d Cir. 2016)........................................................................17

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
    219 F.3d 104 (2d Cir. 2000)......................................................................24

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996)........................................................................20

*Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*,
    No. C 12-05523, 2013 WL 1007666 (N.D. Cal. Mar. 13, 2013)...........15

*Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*,
    No. 20-CV-3471, 2020 WL 6119516 (N.D. Ill. Oct. 16, 2020) ............22

*JUUL Labs, Inc. v. Chou*,
    No. CV 21-3056, 2021 WL 4900374 (C.D. Cal. June 9, 2021) ................15, 24, 25

*Kipling Apparel Corp. v. Rhys*,
    No. 16-CV-990, 2016 WL 8814345 (S.D.N.Y. Feb. 19, 2016)..............27

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading*,
    No. 7-CV-2568, 2007 WL 9723382 (E.D.N.Y. July 19, 2007)..............10, 11, 13

*Lindsey Adelman Studio, LLC v. ZORA Lighting Co.*,
    2019 WL 7599931 (S.D.N.Y. May 29, 2019) ..........................................9

*Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*,
    929 F. Supp. 473 (D.D.C. 1996) ..............................................................23

*Mattel, Inc. v. AnimeFun Store*,
    No. 18-CV-8824, 2021 WL 765766 (S.D.N.Y. Feb. 26, 2021)..............20

*Moose Toys Pty Ltd. v. Thriftway Hylan Blvd. Drug Corp.*,
   No. 15-CV-4483, 2015 WL 4772173 (E.D.N.Y. Aug. 6, 2015) ...........................................16

*N. Face Apparel Corp. v. Moler*,
   No. 12 CIV. 6688, 2015 WL 4385626 (S.D.N.Y. July 16, 2015), *report and
   recommendation adopted*, No. 12 CIV. 6688, 2015 WL 5472939 (S.D.N.Y.
   Sept. 16, 2015) ..................................................................................................................14

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010).............................................................................22, 24

*Next Phase Distrib., Inc. v. John Does 1-27*,
   284 F.R.D. 165 (S.D.N.Y. 2012) .....................................................................................25, 26

*NYP Holdings v N.Y. Post Publ'g Inc.*,
   63 F. Supp. 3d 328 (S.D.N.Y. 2014)................................................................................23, 24

*Opticians Ass'n v. Indep. Opticians*,
   920 F.2d 187 (3d Cir. 1990)...................................................................................................13

*Philip Morris USA Inc. v. Felizardo*,
   No. 3-CV-5891, 2004 WL 1375277 (S.D.N.Y. June 18, 2004) .............................................20

*Philip Morris USA Inc. v. United States Sun Star Trading, Inc.*,
   No. CV 08-0068, 2010 WL 2133937 (E.D.N.Y. Mar. 11, 2010), *report and
   recommendation adopted*, No. 08-CV-0068, 2010 WL 2160058 (E.D.N.Y.
   May 27, 2010).................................................................................................................12, 25

*Playboy Enters. Int'l v. Playboy Enters.*,
   No. 21-CV-6419, 2021 WL 3593357 (S.D.N.Y. Aug. 13, 2021)...........................................10

*Polaroid Corp. v. Polarad Elec. Corp.*,
   287 F.2d 492 (2d Cir. 1961)......................................................................................12, 17, 18

*Power Test Petrol. Distribs., Inc. v. Calcu Gas, Inc.*,
   754 F.2d 91 (2d Cir. 1985)......................................................................................................12

*Salvatore Ferragamo S.p.A. v. Does 1-56*,
   No. 18-CV-12096, 2020 WL 774237 (S.D.N.Y. Feb. 18, 2020).....................................19, 23

*Spin Master Ltd., v. Alan Yuan's Store*,
   325 F. Supp. 3d 413 (S.D.N.Y. 2018)......................................................................17, 18, 19

*Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*,
   924 F. Supp. 17 (S.D.N.Y. 1996) ................................................................................ *passim*

*Topps Co. Inc. v. Gerrit J. Verburg Co.*,
   41 U.S.P.Q.2d 1412 (S.D.N.Y. 1996)....................................................................................18

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*,
   220 F. Supp. 2d 289 (S.D.N.Y. 2002) ..................................................................21

*In re Vuitton Et Fils S.A.*,
   606 F.2d 1 (2d Cir. 1979) .................................................................................16

*Weili Fang and Chee Ray, LLC v. Hangzhou Jiayu Wenhua Chuanmei Youxian Gongsi*,
   2021 WL 1249631 (S.D.N.Y. Apr. 5, 2021) ....................................................8, 27

*World Wrestling Entm't v. John*,
   No. 12-21018-CIV, 2012 WL 12874189 (S.D. Fla. Mar. 22, 2012) ......................25

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) .........................................................................14, 23

**Statutes**

15 U.S.C. § 1051 ...................................................................................................9

15 U.S.C. § 1057(b) .............................................................................................18

15 U.S.C. § 1114(1) .............................................................................................17

15 U.S.C. § 1116(d)(2) .........................................................................................10

15 U.S.C. § 1116(d)(4)(B) ...................................................................................10

15 U.S.C. § 1125(a) .............................................................................................19

28 U.S.C. § 1331 ...................................................................................................9

28 U.S.C. §§ 1338(a)-(b) ......................................................................................9

28 U.S.C. § 1367(a) ...............................................................................................9

28 U.S.C. § 1391(b)(2) ..........................................................................................9

**Other Authorities**

Rebecca Flood, *'Mayo Clinic': Questions Surround NYC Building Overflowing
   With Mayonnaise*, NEWSWEEK (Apr. 13, 2022, 11:16 AM EST) ............................3

**Rules**

C.P.L.R. § 302(a)(1) ..............................................................................................9

C.P.L.R. § 302(a)(3) ..............................................................................................9

Fed. R. Civ. P. 4(k) ...............................................................................................9

Fed. R. Civ. P. 26(b)(2)................................................................................................26

Fed. R. Civ. P. 26(d)(1)...............................................................................................26

Fed. R. Civ. P. 26(f)....................................................................................................25

Fed. R. Civ. P. 65(b)....................................................................................................8

Fed. R. Civ. P. 65(b)(1)...............................................................................................17

Fed. R. Civ. P. 65(c)....................................................................................................27

Fed. R. Civ. P. 65(d)(2)(C)..........................................................................................26

Plaintiff Conopco, Inc. d/b/a/ Unilever ("Unilever") respectfully submits this Memorandum of Law in Support of its *Ex Parte* Application for (1) an *ex parte* temporary restraining order; (2) an order granting an *ex parte* seizure against Defendants 2026 Third Realty, LLC, Hae Hee Kim, Courtney Haejin Kim, Daniel Hungsik Kim, Bryant Kim, and John Does 1-10, inclusive (collectively, the "Defendants"); (3) an order to show cause for preliminary injunction against Defendants; and (4) an order allowing expedited discovery against Defendants, all of whom are actively deceiving the public and threatening consumer health and safety by selling (or otherwise distributing) counterfeit and/or infringing HELLMANN'S-branded mayonnaise (hereinafter, the "Counterfeit Products") in the United States.

## I.      STATEMENT OF FACTS

The following facts, described in detail in the simultaneously filed Declarations of Benjamin Murphy ("Murphy Decl."), Melanie Luca ("Luca Decl."), and Stephen G. Ward ("Ward Decl."), establish Unilever's right to relief.

### A.      Unilever's Registered Trademarks

Unilever is the owner of several valid and subsisting trademark registrations for the HELLMANN'S trademarks and logos, which appear on the Principal Register in the United States Patent and Trademark Office ("PTO"), and alone or in combination on all authentic HELLMANN'S-branded mayonnaise ("Authentic HELLMANN'S Products"), including:

| Mark | Registration No. | Date Registered | Goods/Services |
|------|------------------|-----------------|----------------|
| HELLMANN'S (Stylized) <br> **HELLMANN'S** | 0514280 | August 23, 1949 | Mayonnaise, salad dressings, sandwich spread, and tartar sauce |
|  | 1017067 | July 29, 1975 | Salad dressing, mayonnaise, mayonnaise |

| | | | dressing, and relish sandwich spread; tartar sauce |
|---|---|---|---|
| BLUE RIBBON HELLMANN'S REAL MAYONNAISE  | 1236589 | May 3, 1983 | Mayonnaise |
| BRING OUT THE BEST | 1478873 | March 1, 1988 | Mayonnaise |
| HELLMANN'S 'BRING OUT THE BEST'  | 4721213 | April 14, 2015 | Mayonnaise and salad dressings |
| Richard Hellmann (Stylized)  | 5514321 | July 10, 2018 | Mayonnaise; tartar sauce; sandwich spread comprised primarily of mayonnaise, ketchup, relish, mustard or tartar sauce |
| HELLMANN'S EST. 1913  | 5869191 | September 24, 2019 | Mayonnaise; dressings for salad; ketchup; tomato sauce; sauces; relish; mustard; vinegar. |
| HELLMANN'S EST. 1913  | 6357670 | May 18, 2021 | Oils and fats for food. |

(hereinafter, the "HELLMANN'S Marks").  *See also* Murphy Decl., ¶ 6, Exh. 1.  Since at least

1926, Unilever (including through predecessors) has used the iconic HELLMANN'S brand in

connection with mayonnaise and related food products in the United States.  Murphy Decl., ¶ 3. As a result of billions of dollars in sales, widespread advertising and promotion through virtually every available type of media, and commercial success and recognition, the HELLMANN's Marks have been famous for decades.  *Id.*, ¶ 4.

### B.    Defendants' Illegal Counterfeiting Activities

 Defendants market and sell Counterfeit Products without authorization.  Specifically, on or around April 11, 2022, members of the public noticed large quantities of Counterfeit Products visible through the windows of what appears to be an empty storefront located at 2026 3rd Avenue New York, NY 10029-2886 ("Location").  Murphy Decl., ¶ 7; Ward Decl., ¶ 3.  The Counterfeit Products have attracted attention on social media, which culminated in a NEWSWEEK article commenting on "the mysterious mayonnaise haul . . . in East Harlem."[1]  Murphy Decl., ¶¶ 8-9, Exh. 2; Ward Decl., ¶ 3(a).

In response to the social media and press coverage, Mr. Murphy visited the Location on April 18, 2022.  Murphy Decl., ¶ 10; Luca Decl., ¶ 4; Ward Decl., ¶ 3(b).  The Counterfeit Products were visible through the glass door and windows at the Location.   Murphy Decl., ¶ 10. Photographs taken by Mr. Murphy on April 18, 2022, are shown below:

---

[1]  Rebecca Flood, *'Mayo Clinic': Questions Surround NYC Building Overflowing With Mayonnaise*, NEWSWEEK (Apr. 13, 2022, 11:16 AM EST), https://www.newsweek.com/new-york-building-overflowing-mayonnaise-questions-1697647.

 

*Id.*, Ex. 3.

Thereafter, Unilever conducted a detailed visual inspection and analysis of the Counterfeit Products based on the photographs its employee took at the Location and concluded that the products are almost certainly counterfeit.   Murphy Decl., ¶¶ 10-13; Luca Decl., ¶ 4; Ward Decl., ¶ 3(c).   Specifically, the Counterfeit Products differ from the Genuine HELLMANN'S Products in at least the following respects:

    a.   Unilever does not use the batch code format featured on the Counterfeit Products, below:



Instead, Unilever uses the following unique format to identify the date, plant, production line, and time on the Genuine HELLMANN'S Products:



b. The batch code expiration date appears to be pre-printed on the label of the Counterfeit Products; Unilever does not imprint the batch code date on the labels of its Genuine HELLMANN'S Products, rather the date is later laser coded on to the label during production, at the time the product is packaged at a plant.

c. Genuine HELLMANN'S Products do not use the type of pressure-sensitive labels that appear on the Infringing Products (shown above).

d. Unlike the Genuine HELLMANN'S Products, the shrink wrap around the case of the Counterfeit Products appeared loose, not properly sealed, and likely taped over with package tape:



The shrink wrap on the Genuine HELLMANN'S Products goes through the heat tunnel process to ensure that the shrink wrap is attached tightly to the jars to secure them when transporting the product. By contrast, the shrink wrap on the Counterfeit Products is loose.

e. The graphic on the following Counterfeit Product label differs from the graphic on the Genuine HELLMANN'S Products:

 

**Counterfeit Product**          **Genuine HELLMANN's Product**

Specifically, the Genuine HELLMMANN'S Product label features an image of the eggs on a yellow background.  By contrast, the Counterfeit Product label features an image of the eggs on a blue background, and the image also appears to be upside down.  *Id.*

Subsequent to Unilever's inspection of the photographs taken by Mr. Murphy, through counsel, it engaged Polaris Corporate Risk Management LLC ("Polaris") to conduct an investigation.  Ward Decl., ¶¶ 3-4.  Starting on April 23, 2022, Polaris (1) conducted an in-person inspection of the Location, and (2) researched any individuals that may be affiliated with the Location ("Polaris Investigation").  *Id.*  The Polaris Investigation revealed the following:

a.  The Location is owned by 2026 Third Realty, LLC in the names of individuals Hae Hee Kim and Courtney Haejin Kim.  Both women reside at 152 Delaware Ave., Haworth, New Jersey 07641 ("New Jersey Address").  *Id.*, ¶ 5.

b.  Other individuals with the same last name, Kim, are linked to the Location.  Daniel Hungsik Kim has been affiliated with the Location since August 1, 2006.  Bryant Kim also is linked to the Location.  Like Ms. Hae Hee Kim and Ms. Courtney Haejin Kim, Mr. Daniel Hungsik Kim and Mr. Bryant Kim also have been presently or are recently affiliated with the New Jersey Address.  *Id.*, ¶ 6.

c.   The Location's most recent mortgage documents, dated August 19, 2021, list Ms. Hae Hee Kim as 2026 Third Ave Realty, LLC's Managing Member and Ms. Courtney Haejin Kim as a Member.   *Id.*, ¶ 7.

On April 23, 2022, a Polaris investigator visited the Location.  *Id.*, ¶ 9.  Upon arrival, the investigator found that a metal gate had been pulled down over the entrance to the store, limiting visibility and access.  *Id*.  Although the gate was closed at the time of the April 23, 2022 visit, the investigator approached several nearby residents.  *Id.*, ¶ 10.  Those residents disclosed that the gate concealed numerous containers of Counterfeit Products which they claimed to have observed when the gate was previously opened.  *Id.*  They further confirmed that the storefront had garnered interest from passersby, who would capture images of the Counterfeit Products.  *Id.*

Because Mr. Murphy was denied entrance to the Location (Murphy Decl., ¶¶ 11, 13) and the gate was closed when Unilever's investigator visited the Location on April 23, 2022 (Ward Decl., ¶¶ 10-11), Unilever was not able to secure a physical sample or take additional photographs of the Counterfeit Products.  That said, Unilever has reason to believe there may be additional differences between the Genuine HELLMANN'S Products and the Counterfeit Products (including, most importantly, the contents and quality of the products, which potentially pose serious health and safety threats to the public).   Murphy Decl., ¶¶ 13-17; Luca Decl., ¶¶ 4-9.  As detailed below, the *ex parte* seizure order is necessary to obtain the Counterfeit Products at this time.

## II.   ARGUMENT

Defendants' intentional and unlawful distribution and sale of Counterfeit Products is causing, and will continue to cause, irreparable harm to Unilever's reputation and the goodwill embodied in the HELLMANN'S Marks.   Murphy Decl., ¶¶ 17-18, 21; Luca Decl., ¶¶ 8-9, 12-13.  To stop Defendants' distribution and/or sale of the Counterfeit Products, Unilever respectfully

requests that this Court (1) grant Unilever's application for an *ex parte* seizure of the Counterfeit Products, and (2) issue a Temporary Restraining Order and subsequent Preliminary Injunction enjoining Defendants from distributing or selling any products using the HELLMANN'S Marks or confusingly similar marks, and freezing Defendants' assets related to its counterfeiting and other illegal activities.  Without this relief, Defendants' unlawful activity will continue, and Unilever and consumers will suffer irreparable harm, including serious risk to consumer health and safety.

Rule 65(b) of the Federal Rules of Civil Procedure authorizes courts to issue an *ex parte* temporary restraining order where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition.  FED. R. CIV. P. 65(b).  Defendants distribute, offer to sell, and/or sell Counterfeit Products, posing a risk of substantial harm to the health and safety of consumers and creating a false association in the minds of consumers between the Defendants and Unilever, and deceiving consumers into believing that the Counterfeit Products are genuine.  The entry of a Temporary Restraining Order and subsequent Preliminary Injunction is appropriate because it would immediately stop Defendants' unlawful activities and protect consumer health and safety until a hearing can be held.

In the absence of a Temporary Restraining Order without notice and a subsequent Preliminary Injunction, Defendants can and likely will move their illegal operations to a new, hidden physical location and transfer any illegally-gained assets from U.S.-based bank accounts, which they use for their illegal activities.  Based on these risks, courts have recognized that *ex parte* relief is often appropriate in civil actions against counterfeiting.  *See, e.g.*, *Weili Fang and Chee Ray, LLC v. Hangzhou Jiayu Wenhua Chuanmei Youxian Gongsi*, 2021 WL 1249631, at *2 (S.D.N.Y. Apr. 5, 2021) ("If [d]efendants are given notice of [p]laintiffs' application, they are likely to hide, conceal, transfer or otherwise dispose of their ill-gotten proceeds from their sales of

counterfeit and infringing products."); *Lindsey Adelman Studio, LLC v. ZORA Lighting Co.*, 2019 WL 7599931, at *2 (S.D.N.Y. May 29, 2019) ("Defendants may easily and quickly transfer the registrations for their internet domain name, or modify registration data and content, change hosts, and redirect traffic to other websites, thereby thwarting [p]laintiffs' ability to obtain meaningful relief.").  Unilever respectfully requests that this Court issue the requested *ex parte* Temporary Restraining Order and, upon its expiration, a Preliminary Injunction especially because the Counterfeit Products are food and therefore potentially going to be ingested and may pose a serious risk to health and safety.  *See Gucci Am., Inc. v. Gucci*, No. 7-CV-6820, 2009 WL 8531026, at *28 (S.D.N.Y. Aug. 5, 2009) (granting a permanent injunction to the plaintiff in the context of a wide range of counterfeit goods including coffee, wine, gelato, and cosmetics); *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1092, 2015 WL 845711, at *8 (S.D.N.Y. Feb. 26, 2015) (granting a TRO to the plaintiff in the context of counterfeit frozen food items).

This Court has subject matter jurisdiction over the trademark infringement, counterfeiting, unfair competition, false designation of origin, and dilution claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, 28 U.S.C. §§ 1338(a)-(b), and 28 U.S.C. § 1331.  This Court also has jurisdiction over New York state law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Defendants' Counterfeit Products are located in this Judicial District and Defendants are carrying out their illegal activities in this District.

Personal jurisdiction exists over Defendants in this Judicial District under C.P.L.R. § 302(a)(1) and C.P.L.R. § 302(a)(3), or in the alternative, FED. R. CIV. P. 4(k) because the Defendants are distributing and selling the Counterfeit Products in New York, New York, located

9

within this Judicial District.  Defendants are storing, selling, offering for sale, manufacturing, and/or distributing the Counterfeit Products on their premises at the Location in Harlem (2026 3rd Avenue New York, New York 10029-2886).   Murphy Decl., ¶ 7; Ward Decl., ¶¶ 3, 10.  For this reason alone, this Court can exercise personal jurisdiction over each of the Defendants.

    **A.**    **This Court Should Order an *Ex Parte* Seizure of All Counterfeit Products Possessed by Defendants and All Relevant Documents, Records, Electronically-Stored Information, and Other Materials at the Locations Described in Unilever's Proposed Order**

Section 1116 of the Lanham Act provides eight statutory criteria that must be met before the Court may grant an *ex parte* order of seizure.  *See* 15 U.S.C. § 1116(d)(2); § 1116(d)(4)(B). This Court and others have repeatedly granted applications for an *ex parte* order of seizure where each criterion is fulfilled.  *See*, *e.g.*, *Playboy Enters. Int'l v. Playboy Enters.*, No. 21-CV-6419, 2021 WL 3593357, at *1 (S.D.N.Y. Aug. 13, 2021) (granting preliminary injunction and confirming *ex parte* seizure order); *Gucci Am., Inc. v. Accents*, 955 F. Supp. 279, 282 (S.D.N.Y. 1997) (finding *ex parte* seizure order and preliminary injunction against defendants were properly granted based under Section 1116(d)); *Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*, 924 F. Supp. 17, 21 (S.D.N.Y. 1996) (finding *ex parte* seizure order was properly granted based on the requirements of Section 1116(d)); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading*, No. 7-CV-2568, 2007 WL 9723382, at *2 (E.D.N.Y. July 19, 2007) (granting in part *ex parte* seizure order).

As detailed below and in the attached declarations, Unilever has satisfied each of these criteria.

    **1.**    **Relief Other Than an *Ex Parte* Seizure Order Is Inadequate to Achieve the Purposes of Section 1114**

Any order other than an *ex parte* seizure order is inadequate to stop the counterfeiting and infringement of Unilever's trademarks, protect public health and safety from sales of potentially

dangerous counterfeit mayonnaise and related products, and prevent the destruction of evidence. *See Tommy Hilfiger*, 924 F. Supp. at 20 ("[A]n order, other than an ex parte order, would not have been adequate to stop the infringement of the [p]laintiffs' trademarks by the alleged infringers because . . . any other order would have allowed the destruction of evidence, whether it had been ordered on notice or whether there was no seizure."); *Kun Fung*, 2007 WL 9723382, at *4 ("Any order of this Court short of a seizure order will alert defendants to the action and assist them in disposing of the evidence prior to discovery on this matter.") (citation omitted).  Here, like the defendants in *Tommy Hilfiger* and *Kun Fung*, Defendants are distributing and selling—or planning to sell or distribute—Counterfeit Products, with the intention to deceive unknowing consumers. Because perpetrators of illegal activities invariably ignore the law and are likely to hide evidence of illicit activities if given advance notice, Unilever has reason to believe that Defendants will try to sell off the Counterfeiting Products quickly, and/or will destroy or hide evidence of counterfeiting.  This would put consumers in immediate danger of consuming counterfeit and potentially hazardous products and will make location (and destruction) of these illegal products difficult, if not impossible.  Accordingly, any order other than an *ex parte* seizure order will fail to provide necessary relief.

### 2.    Unilever Has Not Publicized the Requested Seizure

Unilever has not publicized the requested seizure.  Murphy Decl., ¶ 20; Luca Decl., ¶ 11. Moreover, all papers in support of Unilever's application for *ex parte* relief are requested to be kept under seal by the Clerk of this Court pending seizure.

### 3.    Unilever Is Likely to Succeed on its Counterfeiting Claim

In support of its *ex parte* application, Unilever has submitted evidence that Defendants are selling, offering for sale, manufacturing, distributing, and/or planning to sell or distribute Counterfeit Products.  *See generally* Murphy Decl., Luca Decl., and Ward Decl.  Unilever has thus

met its burden of showing likelihood of success on the merits of its counterfeiting claim. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[T]he Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion. . . . Thus, the Court need only determine the more fundamental question of whether there are items to be confused in the first place—that is, whether the items at issue here are, in fact, counterfeit and whether Defendants sold those items."). *See also Philip Morris USA Inc. v. United States Sun Star Trading, Inc.*, No. CV 08-0068, 2010 WL 2133937, at *4 (E.D.N.Y. Mar. 11, 2010), *report and recommendation adopted*, No. 08-CV-0068, 2010 WL 2160058 (E.D.N.Y. May 27, 2010) ("[Defendant] cannot avoid a finding of liability simply because CBP's seizure prevented it from selling the counterfeit goods. . . . [defendant] . . . used the counterfeit marks in commerce by arranging for their transport into the United States. . . . Accordingly, [plaintiff] has made the showing necessary to prevail on its claims of trademark infringement and false designation of origin.").

## 4. Unilever Will Suffer Immediate and Irreparable Injury If the *Ex Parte* Seizure Order Is Not Granted

In a trademark infringement and counterfeiting case, "a showing of confusion as to the source of the product ordinarily will establish that a risk of irreparable harm exists" because a trademark owner's "[r]eputation is not calculable nor . . . compensable." *Tommy Hilfiger*, 924 F. Supp. at 21; *Power Test Petrol. Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985); *see also Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 109 (2d Cir. 1986). Because the Counterfeit Products are visually indistinguishable from genuine HELLMANN's Products to ordinary consumers (Murphy Decl., ¶¶ 7-9; Luca Decl., ¶ 4; Ward Decl., ¶ 3), Defendants' sale and/or distribution of the Counterfeit Products will lead to a loss of control over the HELLMANN'S Marks and damage the goodwill that Unilever has developed in its

HELLMANN'S brand, causing Unilever immediate and irreparable harm. *See Tommy Hilfiger*, 924 F. Supp. at 21 ("[The counterfeit] items are extremely similar and in most cases identical to the trademarks that are registered. Hence, there would be a likelihood of confusion and therefore irreparable injury if immediate action was not taken."); *Kun Fung*, 2007 WL 9723382, at *5 ("'Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut.''" (citing *Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 195 (3d Cir. 1990))). *See also* Murphy Decl., ¶¶ 17-18; Luca Decl., ¶¶ 8-9.

The risk of irreparable harm is even greater in the context of consumable products. Because the Counterfeit Products are not subjected to Unilever's quality control testing (Murphy Decl., ¶ 17; Luca Decl., ¶ 8), they could threaten consumer health and safety and cause substantial damage to consumers and Unilever's reputation. *See CJ Prods. LLC v. Concord Toys Int'l Inc.*, No. 10-CV-5712, 2011 WL 178610, at *5 (E.D.N.Y. Jan. 19, 2011) ("Given that the products are virtually identical, it is highly likely that consumers will confuse them. This is particularly troubling given the potential that defendants' products may pose a potential public health risk . . . thus injuring plaintiffs' reputation even further. . . . [A] harm of this nature is undoubtedly a harm that cannot be redressed by the monetary damages available at law."). Further, without immediate seizure of the Counterfeit Products, Defendants will have an opportunity to destroy or conceal records of their illegal activities, which will also cause immediate and irreparable injury to Unilever by making it difficult (if not impossible) not only uncover potential manufacturers, distributors, and retailers (*i.e.*, the supply chain) of the Counterfeit Products, but also to ascertain the damages caused by Defendants. *See Kun Fung*, 2007 WL 9723382, at *5.

In sum, Unilever will suffer immediate and irreparable harm if the Counterfeit Products are not immediately seized.

### 5. The Counterfeit Products and Other Specified Materials to Be Seized Are Located at the Places Identified in the Order

As detailed in the Murphy Decl., Luca Decl., and Ward Decl., Unilever conducted an extensive investigation, using property research and private investigator documentation, to identify where the Counterfeit Products are located.   Photographs of the Counterfeit Products at the Location are attached to the Murphy Declaration.   Murphy Decl., ¶¶ 10-12, Ex. 3.   Unilever's investigation has amassed significant evidence pointing to specific locations where the Counterfeit Products will be found.   Murphy Decl., ¶¶ 10-12; Ward Decl., ¶¶ 3-10.

### 6. The Harm to Unilever and the Consuming Public in Denying the Order Outweighs the Harm to the Interests of Defendants

Defendants are engaging in illegal sales of counterfeit food products, and as such, Defendant will not suffer any legally cognizable harm from the requested seizure.   Unilever's application for *ex parte* seizure is directed to the Counterfeit Products and documentary evidence of Defendants' unlawful activities, and Defendants have no legitimate interest in these items. "[I]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (citation omitted); *see also N. Face Apparel Corp. v. Moler*, No. 12 CIV. 6688, 2015 WL 4385626, at *9 (S.D.N.Y. July 16, 2015), *report and recommendation adopted*, No. 12 CIV. 6688, 2015 WL 5472939 (S.D.N.Y. Sept. 16, 2015) (internal citations omitted).   For its part, Unilever will suffer immediate and irreparable harm in the absence of emergency relief because (1) Unilever's reputation will suffer if consumers become ill from consuming the Counterfeit Products; (2) Unilever has a legitimate interest in protecting the goodwill associated with its HELLMANN'S Marks; and (3) Unilever will be unable to ascertain the scope of damages incurred from Defendants' unlawful activities if the

Counterfeit Products and other evidence of counterfeiting is hidden or destroyed.   Murphy Decl., ¶¶ 17-18, 21-23; Luca Decl., ¶¶ 8-9, 12-13.

The *ex parte* seizure remedy in 15 U.S.C. § 1116 was added to the Lanham Act as part of the Trademark Counterfeiting Act of 1984. The remedy was designed to provide increased sanctions for the counterfeiting "of certain registered trademarks," both to prevent economic loss, and "grave risks to the health and safety of consumers" presented by counterfeits. *Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, No. C 12-05523, 2013 WL 1007666, at *3 (N.D. Cal. Mar. 13, 2013) (citing H.R. Rep. No. 98–997 at 4 (1984)); *see also JUUL Labs, Inc. v. Chou*, No. CV 21-3056, 2021 WL 4900374, at *10 (C.D. Cal. June 9, 2021) ("Defendants' conduct poses a threat to health and safety. The functionality, performance, and safety of Defendants' products is unknown. . . . [plaintiff] has no control over the design, manufacturing, and packaging of Defendants' products and has no way of testing the safety of these products . . . [and] Defendants' products are not subjected to [plaintiff's] quality-control standards and testing…"); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 192 (S.D.N.Y. 2020) (granting TRO to stop sale of counterfeit N95 masks in part based on public health and safety risks posed by the counterfeit masks; "3M cannot control whether the products that Defendant is offering for sale and/or selling . . . adhere to 3M's rigorous quality-control standards . . . . This constitutes irreparable harm.").   Like in *JUUL Labs* and *3M*, Unilever has no means of knowing whether the Counterfeit Products are safe for human consumption because they have not been subjected to Unilever's quality control standards and testing.  Murphy Decl., ¶ 17; Luca Decl., ¶ 8.  As a result, Unilever stands to suffer irreparable harm and the health and safety of unknowing consumers is at risk, warranting immediate seizure of the Counterfeit Products.  *See 3M Co.*, 458 F. Supp. at 198

("When lives are at stake and time is of the essence, as is clearly the case in this crisis, the public interest demands accountability . . . . Accordingly, the preliminary injunction shall issue.").

>    **7.    Defendants, or Others Acting in Concert With Them, Would Destroy, Move, Conceal, Or Otherwise Make Unavailable Evidence If Unilever Were to Proceed on Notice**

As discussed above, given Defendants' brazen efforts to evade the law and distribute and sell the Counterfeit Products, Unilever has reason to believe that Defendants will attempt to sell or dispose of the products and destroy the records of their illegal activities.  As such, Unilever's application for *ex parte* seizure should be granted.  *See In re Vuitton Et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) ("[I]f notice is required, that notice all too often appears to serve only to render fruitless further prosecution of [trademark infringement] action[s]"); *Moose Toys Pty Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15-CV-4483, 2015 WL 4772173, at *3 (E.D.N.Y. Aug. 6, 2015) (granting in part *ex parte* seizure order, noting "[c]ourts in this Circuit have not hesitated to exercise that authority in infringement cases in which there is a danger the defendants will destroy, conceal, or transfer counterfeit goods."); *Tommy Hilfiger*, 924 F. Supp. at 20 (noting that requiring notice—and thus creating a risk that evidence could be destroyed—"is directly contrary to the purpose of [the Lanham Act].").

>    **B.    Unilever is Entitled to a Temporary Restraining Order and Subsequent Preliminary Injunction**

The standard for granting a temporary restraining order and the standard for granting a preliminary injunction are synonymous.  *3M Co.,* 458 F. Supp. 3d at 191.  A party seeking to obtain either relief must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of an injunction; (3) that the balance of hardships favors the plaintiff; and (4) that the public interest will not be disserved if an injunction issues. *Id*.

If a party requests an *ex parte* temporary restraining order, the "Court must also determine whether '(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damages will result to the movant before the adverse party can be heard in opposition,' and '(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.'" *Cengage Learning, Inc. v. Doe 1*, No. 18-CV-403, 2018 WL 2244461, at *1 (S.D.N.Y. Jan. 17, 2018) (quoting Fed. R. Civ. P. 65(b)(1)).

### 1.     Unilever Is Likely to Succeed on the Merits of Each of its Claims

### a.     Unilever Is Likely to Succeed on the Merits

The Lanham Act provides that a defendant is liable for trademark infringement and counterfeiting if a defendant, "without the consent of the registrant, uses in commerce any reproduction, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . which such use[s] is likely to cause confusion, or to cause mistake, or to deceive."   15 U.S.C. § 1114(1).   Courts examine: (1) whether the plaintiff's mark is entitled to protection and (2) whether defendant's use of the mark is likely to cause confusion.  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016); *Spin Master Ltd., v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 420 (S.D.N.Y. 2018); *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 520 (S.D.N.Y. 2019).

"The first prong is satisfied by showing that a mark is valid and registered, owned by a registrant, and that the registrant has the exclusive right to use the mark in commerce."  *Spin Master*, 325 F. Supp. 3d at 421.  A valid certificate of registration of the asserted mark satisfies the first prong.  *BBK Tobacco & Foods*, 408 F. Supp. 3d at 520.

Once the first prong has been established, courts in this Circuit apply the eight "Polaroid factors" balancing test to determine whether the defendant's use of the mark is likely to cause confusion.  *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  Because

counterfeit marks are inherently confusing, however, "courts in this District generally agree that 'where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing.'"  *Spin Master*, 325 F. Supp. 3d at 421 (quoting *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F.Supp.2d 368, 383 (S.D.N.Y. 2010) (citing cases); *Topps Co. Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the *Polaroid* factors.").

Unilever satisfies both prongs. First, Unilever's HELLMANN'S Marks are registered with the United States Patent and Trademark Office on the Principal Register, are valid and subsisting, and many are incontestable.  Murphy Decl., ¶ 6.  The registrations for the HELLMANN'S Marks are *prima facie* evidence of their validity and of Unilever's exclusive right to use the HELLMANN'S Marks under 15 U.S.C. § 1057(b).  From Unilever's longstanding use of the HELLMANN'S Marks and stringent quality control testing, the HELLMANN'S Marks signify to consumers that the products come from Unilever and are manufactured to the highest quality standards.   Murphy Decl., ¶ 5.  Second, Defendants—who have *not* been licensed or authorized by Unilever to use the HELLMANN'S Marks or distribute Unilever products—are engaged in unauthorized use of the HELLMANN'S Marks to confuse and deceive the consuming public into thinking that Defendants' Counterfeit Products are manufactured by or emanate from Unilever, which is sufficient to establish likelihood of confusion.  *See Spin Master*, 325 F. Supp. 3d at 422 ("The sale of counterfeit goods is sufficient use to establish liability.").

Unilever has thus established that they have a reasonable likelihood of success on the merits for its trademark infringement and counterfeiting claims.

> **b.      Unilever Is Likely to Succeed on the Merits of its Unfair Competition and False Designation of Origin Claim**

The same test is required to establish likelihood of success on the merits of claims for unfair competition and false designation of origin. *Spin Master*, 325 F. Supp. 3d at 423.  To prove false designation of origin and unfair competition under 15 U.S.C. § 1125(a), a plaintiff must demonstrate: (1) that it has a valid, protectable trademark; and (2) a likelihood of confusion to the origin of the plaintiff's products. *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12096, 2020 WL 774237, at *2 (S.D.N.Y. Feb. 18, 2020).  Because the HELLMANN'S Marks are registered marks, and Unilever has established a likelihood of success on the merits of its trademark infringement and counterfeiting claim against Defendants, as shown above, a likelihood of success also exists on the merits for Unilever's false designation of origin and unfair competition claims.

> **c.      Unilever Is Likely to Succeed on the Merits of its New York Unfair Competition Claim**

A plaintiff who has demonstrated a likelihood of success on the merits of a Lanham Act claim also demonstrates a likelihood of success on the merits of an unfair competition claim based on New York common law as long as the plaintiff can show that the defendants acted in bad faith. *See Ferragamo*, 2020 WL 774237, at *4 (internal quotations and citations omitted); *Spin Master*, 325 F. Supp. 3d at 424 ("The essence of a claim for unfair competition under New York law is that the defendant has misappropriated the labors and expenditures of another in a manner likely to cause confusion or to deceive purchasers as to the origin of the goods.") (internal citations and quotations omitted).

Because Unilever has established a likelihood of success on the merits of its trademark infringement and counterfeiting claim against Defendants, as shown above, bad faith is presumed. *See Ferragamo*, 2020 WL 774237, at *4 ("Under New York law, a presumption of bad faith

attaches to the use of a counterfeit mark.") (quoting *Philip Morris USA Inc. v. Felizardo*, No. 3-CV-5891, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004)); *Mattel, Inc. v. AnimeFun Store*, No. 18-CV-8824, 2021 WL 765766, at *7 (S.D.N.Y. Feb. 26, 2021) (same).  Thus, Unilever has established a likelihood of success on the merits of its unfair competition claims under New York law.

> **d.     Unilever Is Likely to Succeed on the Merits of Its Federal and New York Dilution Claims**

Defendants' distribution and sale of the Counterfeit Products intentionally dilutes the distinctive quality of the famous HELLMANN'S Marks.  There are two types of dilution under federal and New York trademark law: dilution by blurring and dilution by tarnishment.  Dilution by blurring refers to the "gradual diminishment of a famous mark's acquired ability to clearly and unmistakably distinguish one source through unauthorized use."  *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 458 (S.D.N.Y. 2017) (citing *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996)) (internal quotations omitted).  A claim of dilution by tarnishment "arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product."  *Id*. at 460 (citing *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994).

Federal trademark dilution claims require showing that "(1) the mark is famous; (2) defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment."  *DigitALB, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (citation omitted). The legal standard for New York trademark dilution claims is "essentially the same" as that applied to federal trademark dilution claims, and the claims may be analyzed

together.  *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002).

Unilever satisfies each prong of the dilution analysis.  First, the HELLMANN'S Marks are famous.  *See supra* 1.A.  Second, there is no question that Defendants' distribution or sale of the Counterfeit Products constitutes commercial use.  Third, because Unilever and its predecessors have used the iconic HELLMANN'S Marks in connection with mayonnaise and related food products in the United States for many decades (Murphy Decl., ¶¶ 3-4), it is indisputable that the HELLMANN'S Marks became famous prior to Defendants' commercial use.

Fourth, Defendants' use of the HELLMANN'S Marks is likely to dilute the quality of the HELLMANN'S Marks by blurring or tarnishing because the sale and distribution of counterfeit goods results in dilution by blurring and tarnishment as a matter of law.  *See Burberry Ltd. v. Euro Moda, Inc.*, 2009 U.S. Dist. LEXIS 53250, at *40 (S.D.N.Y. June 10, 2009) (finding that Burberry made a sufficient showing of dilution *per se* based on defendants' distribution of counterfeit goods, noting that "when identical marks are used on similar goods, dilution—the capacity of the famous mark to identify and distinguish the goods of the trademark holder—obviously occurs" (internal quotations and citations omitted).  Regarding dilution by blurring, counterfeit products, such as those being sold and distributed by Defendants, necessarily diminish a mark's ability to serve as the unique identifier of any good's specific source.  *See id*.  Regarding dilution by tarnishment, the counterfeit mayonnaise products here may pose a serious danger to public health and safety, damaging the iconic HELLMANN'S Marks.. *Barefoot Contessa*, 2015 WL 845711 at *7 (granting a TRO to the plaintiff in the context of counterfeit frozen food in part because the inferior nature of the counterfeit goods damaged the plaintiff's reputation).  Murphy Decl., ¶¶ 17-18, 21-22; Luca Decl., ¶¶ 8-9, 12-13.

For the reasons stated above, Unilever has established a likelihood of success on the merits of its federal and New York dilution claims.

### 2.   Unilever Has No Adequate Remedy at Law and, Absent a Preliminary Injunction, Will Suffer Irreparable Harm

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). As such, "[i]t is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); *see also 3M Co.*, 458 F. Supp. 3d at 192 (noting that the inability of the trademark holder to control the quality of the infringing goods constitutes irreparable harm). Where confusion is likely—such as in the case of counterfeit goods—"the requisite irreparable harm is established as a matter of course. *NYC Triathlon*, 704 F. Supp. 2d at 325–26. Here, Defendants' unauthorized use of the HELLMANN'S Marks has and continues to irreparably harm Unilever and the public large because the Counterfeit Products may be dangerous to consume. Murphy Decl., ¶¶ 17-18, 21-22; Luca Decl., ¶¶ 7-9, 12-13. Moreover, the Counterfeit Products harm the HELLMANN'S brand and Unilever's reputation and goodwill. Murphy Decl., ¶¶ 17-18, 21-22; Luca Decl., ¶¶ 8-9, 12-13. As such, monetary damages are inadequate compensation for such harm. *See e.g., Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*, No. 20-CV-3471, 2020 WL 6119516, at *17 (N.D. Ill. Oct. 16, 2020) (granting preliminary injunction to stop counterfeit medical device sales, noting that "any harm to Defendants is much more easily compensable in money damages than injury or death caused by allowing Defendants' counterfeit products to continue entering the market during the pendency of the lawsuit."); *Concord Toys*, 2011 WL 178610, at *5 (granting a preliminary

injunction to enjoin sales of counterfeit toys; "Given that the products are virtually identical, it is highly likely that consumers will confuse them. This is particularly troubling given the potential that defendants' products may pose a potential public health risk… a harm of this nature is undoubtedly a harm that cannot be redressed by the monetary damages available at law.").

Defendants' activities threaten consumer health and safety, harm Unilever's reputation and goodwill, and may divert Unilever's consumers as a result of a loss of consumer trust in the HELLMANN's brand.   These harms are irreparable as they are incalculable.   Accordingly, immediate injunctive relief is necessary to stop Defendant's activities.  *See NYP Holdings v N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 341-42 (S.D.N.Y. 2014); *Ferragamo*, 2020 WL 774237, at *5.

### 3.     The Balance of Hardships Weighs in Unilever's Favor

Defendants will not suffer any legally cognizable hardship from refraining in their illegal activities.  See *3M Co.*, 458 F. Supp. 3d at 197 ("It would not be a 'hardship' for Defendant[s] to refrain from engaging in unlawful activities related to [the plaintiff's] brand."); *WPIX, Inc.* 691 F.3d  at 287 ("an […] infringer cannot complain about the loss of ability to offer its infringing product").   In particular, the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the [p]laintiffs' trademark."   *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996); *Estee Lauder, Inc. v. Watsky*, 323 F.Supp. 1064, 1068 (S.D.N.Y. 1970) ("To the plaintiff its name is at stake, and continued injury to its reputation and good will would be a far more serious blow to it than the curtailment of the sale by the defendants would be to them.").

Here, because Defendants are violating the law and endangering the public by distributing and selling the Counterfeit Products in attempt to deceive consumers, the balance of equities favors Unilever.  Accordingly, injunctive relief is appropriate.

### 4.    Threat to Public Health and Safety from the Counterfeit Products Supports the Issuance of a Preliminary Injunction

A temporary restraining order (and subsequent preliminary injunction) favors the public interest because it will prevent potential grave harm to consumer health and safety and stop Defendants from violating federal and state intellectual property law.  It is widely recognized that in addition to protecting the property right of an individual, trademark laws are also concerned with the protection of the public from being deceived.  *See 3M Co. v. Individuals, P'ships, & Unincorporated Ass'ns identified in Schedule "A"*, No. 20-CV-2348, 2020 WL 6817650, at *3 (D. Minn. Nov. 20, 2020) (granting TRO against sales of counterfeit masks, noting that "public policy weighs in favor of protecting consumers against the infringement by enjoining a defendant from distributing the infringing products… especially…where the counterfeit product allegedly risks harm to public health."); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107–08 (2d Cir. 2000) ("[t]rademark laws exist to protect the public from confusion."); *NYC Triathlon*, 704 F. Supp. 2d at 344 ("[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."); *NYP Holdings*, 63 F. Supp. 3d at 342 (consumers have a "protectable interest in being free from confusion, deception and mistake").

This Court and others have repeatedly found that injunctive relief is appropriate to protect the public from deception in the marketplace, especially in cases where counterfeit products threaten consumer health and safety.  *See e.g.*, *JUUL*, 2021 WL 4900374, at *10 (granting injunctive relief to enjoin sale of counterfeit vaping supplies, noting that " [p]ublic policy supports shutting down counterfeiters to protect end-consumers"); *3M Co.*, 458 F. Supp. 3d at 198-99 ("When lives are at stake and time is of the essence, as is clearly the case in this crisis, the public interest demands accountability... Accordingly, the preliminary injunction shall issue."); *3M*, 2020

WL 6817650, at *3 ("Where…a plaintiff has shown a likelihood of success on a trademark-infringement claim, public policy weighs in favor of protecting consumers against the infringement by enjoining a defendant from distributing the infringing products.  This principle is especially true where the counterfeit product allegedly risks harm to public health.") (internal citations omitted) (emphasis added); *World Wrestling Entm't v. John*, No. 12-21018-CIV, 2012 WL 12874189, at *2 (S.D. Fla. Mar. 22, 2012) (granting temporary restraining order, noting that "[i]n addition to bearing counterfeit marks, the Enjoined [t-shirts] also present a potential safety hazard to the public because there is no way to know the quality of these goods, such as the flammability level of the ink used to print the t-shirts and the safety of the design of the masks."); *Philip Morris*, 2010 WL 1196124, at *5.   As discussed above, injunctive relief serves the public interest in this case because it will prevent consumers from mistakenly purchasing non-genuine and potentially dangerous food products.   Defendants' distribution and sale of counterfeit HELLMANN'S mayonnaise causes harm to consumers who are misled into buying what they mistakenly believe is Genuine HELLMANN'S Products.   And, as discussed above, because the counterfeit products are not subjected to Unilever's quality control standards and testing, they may be unfit for human consumption and could pose a significant risk to consumers' health and safety.   Such harm merits immediate injunctive relief.   *See e.g., JUUL Labs*, 2021 WL 4900374, at *10; *3M Co.*, 458 F. Supp. at 198; *Philip Morris*, 2010 WL 1196124, at *5.

For the reasons stated above, Unilever's request for a Temporary Restraining Order and subsequent Preliminary Injunction should be granted.

### C.    Unilever's Motion for Expedited Discovery Should Be Granted

A court may grant a request for expedited discovery under Federal Rule of Civil Procedure 26(f).  *See Next Phase Distrib., Inc. v. John Does 1-27*, 284 F.R.D. 165, 171 (S.D.N.Y. 2012)

(citing Fed. R. Civ. P. 26(d)(1)).  This Court grants requests for expedited discovery based on reasonableness and good cause.  *Id.  See also Cengage*, 2018 WL 2244461 at *4.

## 1.    Expedited Discovery Is Necessary to Effectuate the Requested Equitable Relief

Courts may exercise discretion over discovery and can permit expedited discovery to aid identification of unknown defendants, additional locations of counterfeit products and related records, and bank accounts used for the counterfeit and/or infringing activities.  *See* Fed. R. Civ. P. 26(b)(2); *adMarketplace, Inc. v. Tee Support Inc*., No. 13-CV-5635, 2013 WL 4838854, at *2 (S.D.N.Y. Sept. 11, 2013) (collecting cases).  Unilever requests expedited discovery to discover bank and payment-system accounts Defendants use for their counterfeit sales operations.  The discovery requested on an expedited basis in Unilever's Proposed Order has been limited to include only what is essential to prevent further irreparable harm.  Discovery of Defendants' bank and payment system accounts is necessary so that the accounts can be frozen, which will ensure these activities will be contained.  Without expedited discovery, any asset restraint would be of limited value because Unilever would not know the entities upon whom to serve the order.

Further, Federal Rule of Civil Procedure 65(d)(2)(C) allows this Court to bind any third party who is in active concert with the Defendants and who is given notice of the order to provide expedited discovery in this action. Fed. R. Civ. P. 65(d)(2)(C).  Defendants have engaged in deceptive practices by attempting to conceal their operations and preventing individuals from accessing the property to inspect the Counterfeit Products.  Murphy Decl., ¶ 11; Ward Decl., ¶ 9. Therefore, without the requested relief, Unilever's seizure and asset restraint in the Temporary Restraining Order may have little meaningful effect.  Accordingly, expedited discovery is appropriate here.

### 2.      The Injury to Unilever and the Consuming Public Absent Expedited Discovery Exceeds Any Potential Injury to Defendants

Unilever and the consuming public will continue to suffer injury if the full extent of Defendants' counterfeiting scheme is not immediately determined.   In contrast, Defendants would face little hardship from expedited discovery.  Unilever's expedited discovery requests are limited and narrowly-tailored, and because Defendants' own conduct has compelled Unilever to bring the subject action, Defendants have knowledge regarding those discovery requests.

### D.      Unilever's Request for a Security Bond in the Amount of $5,000 Is Adequate

Courts have "wide discretion" on whether to require the posting of and amount of a security upon issuance of a temporary restraining order or preliminary injunction. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); Fed. R. Civ. P. 65(c).  In light of the strong evidence of counterfeiting, infringement, and unfair competition, Unilever respectfully requests that this Court require Unilever to post a bond of no more than Five Thousand U.S. Dollars ($5,000.00). Unilever submits that a bond in such amount is fair and reasonable under the circumstances.  This amount is consistent with—if not higher than—bond amounts required by courts in analogous cases. *See, e.g., Kipling Apparel Corp. v. Rhys*, No. 16-CV-990, 2016 WL 8814345, at *3 (S.D.N.Y. Feb. 19, 2016) ($5,000 bond); *Cengage*, 2018 WL 2244461, at *6 ($2,500 bond); *Weili Fang*, 2021 WL 1249631, at *6 ($1,000 bond).  Indeed, this Court has gone as far as to hold that no security bond is necessary in counterfeiting circumstances.  *See Mattel, Inc. v. 86755*, et al., No. 18-cv-8825, * (S.D.N.Y. Oct. 4, 2018) (The Hon. Richard J. Sullivan did not require a bond.)

## III.    CONCLUSION

Unilever's consumers, business, and reputation are being irreparably harmed.  Without entry of the requested relief, the sale of Counterfeit Products will continue to lead prospective purchasers and others to believe that Defendants' products have been manufactured by or emanate

from Unilever, as well as threaten consumer health and safety. Therefore, entry of an *ex parte* order is necessary to protect Unilever's trademark rights, to prevent further harm to Unilever and the consuming public. Unilever respectfully requests that this Court grant Unilever's application for (1) an Order Granting *Ex Parte* Seizure against Defendants; (2) a Temporary Restraining Order; (3) an Order to Show Cause for Preliminary Injunction against Defendants; and (4) an Order Allowing Expedited Discovery against Defendants.

Dated:  April 27, 2022

Respectfully submitted,

William P. Deni, Jr.
J. Brugh Lower
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Tel: 212-613-2000
Fax: 212-290-2018
wdeni@gibbonslaw.com
jlower@gibbonslaw.com

Anna Naydonov (*pro hac vice* to be filed)
Mary Kate Brennan
Spencer K. Beall (*pro hac vice* to be filed)
Rosie Norwood-Kelly (*pro hac vice* to be filed)
**FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400

*Attorneys for Plaintiff
Conopco, Inc. d/b/a Unilever*