USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/8/2022___

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONOPCO, INC. d/b/a UNILEVER, | **Case No. 22 Civ. 3480 (AT)** |
| *Plaintiff,* | |
| v. | **PRELIMINARY INJUNCTION ORDER** |
| 2026 THIRD REALTY, LLC, HAE HEE KIM, COURTNEY HAEJIN KIM, DANIEL HUNGSIK KIM, BRYANT KIM, K & K FOOTWEAR, INC., YOUSSOUF DIAGOURAGA, MUSTUFA GANCHI, AMIS DISCOUNTED FURNITURE, LLC, VIBRANT PRINTING AND GRAPHIC CORP., MOHAMAD GANCHI, LAMIN HUMMA, SARJO DAMBELLY, AND JOHN DOES 1–10, inclusive, | |
| *Defendants.* | |

**WHEREAS**, on April 27, 2022, Plaintiff, Conopco, Inc. d/b/a/ Unilever ("Unilever"), commenced this action under seal against Defendants 2026 Third Realty, LLC, Hae Hee Kim, Courtney Haejin Kim, Daniel Hungsik Kim, Bryant Kim, K & K Footwear, Inc., and John Does 1–10, and sought the entry of an *ex parte* temporary restraining order, an order authorizing an *ex parte* seizure of counterfeit goods under 15 U.S.C. § 1116(d), an order to show cause for a preliminary injunction, and an order permitting expedited discovery (collectively, the "Original TRO Application").  Unilever also filed the Declarations of Benjamin Murphy ("Murphy Decl."), Melanie Luca ("Luca Decl."), Mary Kate Brennan ("Brennan Decl."), and Stephen Ward ("First Ward Decl.") in support of the Original TRO Application.

1

**WHEREAS**, on April 28, 2022, the Honorable Paul G. Gardephe issued a sealing order. ECF No. 1.

**WHEREAS**, on April 29, 2022, the Court granted Unilever's Original TRO Application and entered an *Ex Parte* Temporary Restraining Order; Order Authorizing *Ex Parte* Seizure; Order to Show Cause for Preliminary Injunction; and Order Allowing Expedited Discovery ("Original TRO").  ECF No. 53.

**WHEREAS**, after seizing certain documents and things in accordance with the Original TRO on May 3, 2022, Unilever filed a letter motion seeking emergency modification of the First TRO and a proposed Amended Complaint to add Youssouf Diagouraga, Mustafa Ganchi, AMIS Discounted Furniture, LLC, and Vibrant Printing and Graphic Corp. as named Defendants (collectively, the "First Amended TRO Application").  Unilever also filed the May 3, 2022 Declaration of Stephen Ward ("Second Ward Decl."), May 4, 2022 Declaration of Stephen Ward ("Third Ward Decl."), Declaration of Angel Martinez ("Martinez Decl."), and May 3, 2022 Declaration of Mary Kate Brennan ("Supp. Brennan Decl.") in support of the First Amended TRO Application.

**WHEREAS**, on May 6, 2022, the Court entered an amended *Ex Parte* Temporary Restraining Order; Order Authorizing *Ex Parte* Seizure; Order to Show Cause for Preliminary Injunction; and Order Allowing Expedited Discovery ("First Amended TRO").  ECF No. 54.

**WHEREAS**, on May 13, 2022, the Court unsealed the case.  ECF No. 8.

**WHEREAS**, after seizing additional documents and things in accordance with the First Amended TRO on May 12, 2022, Unilever filed a second supplemental application on May 19, 2022 to amend the First Amended TRO and Amended Complaint to add Mohamad Ganchi, Lamin Humma, and Sarjo Dambelly as named Defendants (collectively, the "Second Amended

TRO Application").[1]  Unilever also filed the May 19, 2022 Declaration of Stephen Ward

("Fourth Ward Decl.") and Declaration of Steven Cannon ("Cannon Decl.") in support of the

Second Amended TRO Application.

WHEREAS, on May 20, 2022, the Court entered an order extending the First Amended

TRO until May 27, 2022.  ECF No. 60.  The Court's May 20, 2022 Order also granted

Unilever's request to file its Second Amended Complaint.

WHEREAS, on May 20, 2022, Unilever filed the Second Amended Complaint.  ECF

No. 61.

WHEREAS, on May 26, 2022, the Court entered a second amended *Ex Parte* Temporary

Restraining Order; Order to Show Cause for Preliminary Injunction; and Order Allowing

Expedited Discovery ("Second Amended TRO"), and scheduled an Order to Show Cause

Hearing for June 8, 2022 at 4:00 p.m. ("OSC Hearing").  ECF No. 81.

WHEREAS, all Defendants were served with notice of the OSC Hearing.  *See* ECF Nos.

82–94.

WHEREAS, Defendants did not file any papers opposing the entry of a preliminary

injunction.

WHEREAS Defendants Daniel Kim, Hae Hee Kim,  Courtney Kim, 2026 Third Realty

LLC, and K&K Footwear (the "Kim Defendants"), and counsel for Unilever appeared at the

OSC Hearing on July 8, 2022, and the Court granted the Kim Defendants' request for additional

time to locate counsel and respond to the entry of any preliminary injunction.

WHEREAS the remaining Defendants did not appear at the OSC Hearing:

---

[1] Where a defined term is referenced and not defined herein, the defined term should be understood as it is defined
in the Second Amended Complaint or Second Amended TRO Application.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Unilever is the owner of several valid and subsisting trademark registrations for

the HELLMANN'S trademarks and logos, which appear on the Principal Register in the United

States Patent and Trademark Office ("PTO"), and alone or in combination on all authentic

HELLMANN'S-branded mayonnaise ("Genuine HELLMANN'S Products"), including:

| Mark | Registration No. | Date Registered | Goods/Services |
|---|---|---|---|
| HELLMANN'S (Stylized)  | 0514280 | August 23, 1949 | Mayonnaise, salad dressings, sandwich spread, and tartar sauce |
|  | 1017067 | July 29, 1975 | Salad dressing, mayonnaise, mayonnaise dressing, relish sandwich spread, and tartar sauce |
| BLUE RIBBON HELLMANN'S REAL MAYONNAISE  | 1236589 | May 3, 1983 | Mayonnaise |
| BRING OUT THE BEST | 1478873 | March 1, 1988 | Mayonnaise |
| HELLMANN'S 'BRING OUT THE BEST'  | 4721213 | April 14, 2015 | Mayonnaise and salad dressings |
| Richard Hellmann (Stylized)  | 5514321 | July 10, 2018 | Mayonnaise, tartar sauce, sandwich spread comprised primarily of mayonnaise, ketchup, relish, mustard, or tartar |

4

| Mark | Registration No. | Date Registered | Goods/Services |
|------|------------------|-----------------|----------------|
| | | | sauce |
| HELLMANN'S EST. 1913  | 5869191 | September 24, 2019 | Mayonnaise, dressings for salad, ketchup, tomato sauce, sauces, relish, mustard, and vinegar. |
| HELLMANN'S EST. 1913  | 6357670 | May 18, 2021 | Oils and fats for food. |

(hereinafter, the "HELLMANN'S Marks").  Murphy Decl., 6, Ex. 1.

2.      Since at least 1926, Unilever (including through predecessors) has used the HELLMANN'S brand in connection with mayonnaise and related food products in the United States.  *Id.* ¶ 3. As a result of billions of dollars in sales, advertising, and promotion, the HELLMANN'S Marks are well-known.  *Id.* ¶ 4.

3.      Defendants have been marketing and selling Counterfeit Products without authorization. Specifically, on or around April 11, 2022, members of the public noticed large quantities of Counterfeit Products visible through the windows of what appears to be an empty storefront located at 2026 3rd Avenue New York, New York 10029-2886 ("First Location").  *Id.* ¶ 7; First Ward Decl. ¶ 3.

4.      The Counterfeit Products have attracted attention on social media, which culminated in a NEWSWEEK article commenting on "the mysterious mayonnaise haul . . . in East Harlem."[2]  Murphy Decl. ¶¶ 8–9, Ex. 2; First Ward Decl. ¶ 3(a).

5.      In response to the social media and press coverage, Benjamin Murphy, a Business Development Manager at Unilever, visited the First Location on April 18, 2022.  Murphy Decl. ¶¶ 7–11; Luca Decl. ¶ 4; First Ward Decl. ¶ 3(b).

6.      The Counterfeit Products were visible through the glass door and windows at the First Location.  Murphy Decl. ¶ 10.

7.      Photographs taken by Mr. Murphy on April 18, 2022, are shown below:



*Id*., Ex. 3.

<hr />

[2] Rebecca Flood, *'Mayo Clinic': Questions Surround NYC Building Overflowing with Mayonnaise*, NEWSWEEK (Apr. 13, 2022), https://www.newsweek.com/new-york-building-overflowing-mayonnaise-questions-1697647.

8.      Unilever then conducted a detailed visual inspection and analysis of the

Counterfeit Products based on the photographs its employee took at the First Location and

concluded the products are likely counterfeits, based on the following differences:

a.      Unilever does not use the batch code format featured on the Counterfeit Products,

below:



Instead, Unilever uses the following unique format to identify the date, plant,

production line, and time on the Genuine HELLMANN'S Products:



b.      The batch code expiration date appears to be pre-printed on the label of the

Counterfeit Products; Unilever does not imprint the batch code date on the labels

of its Genuine HELLMANN'S Products, rather the date is laser coded onto the

label during production at the time the product is packaged at a plant.

c.      Genuine HELLMANN'S Products do not use the type of pressure-sensitive

labels that appear on the Counterfeit Products (shown above).

d.      Unlike the Genuine HELLMANN'S Products, the shrink-wrap around the case of

the Counterfeit Products appeared loose, not properly sealed, and likely taped

over with package tape:



The shrink-wrap on the Genuine HELLMANN'S Products goes through the heat tunnel process to ensure that the shrink-wrap is attached tightly to the jars to secure them when transporting the product.  By contrast, the shrink wrap on the Counterfeit Products is loose.

e.     The graphic on the following Counterfeit Product label differs from the graphic on the Genuine HELLMANN'S Products:



**Counterfeit Product**          **Genuine HELLMANN's Product**

8

Specifically, the Genuine HELLMANN'S Product label features an image of eggs on a yellow background.  By contrast, the Counterfeit Product label features an image of eggs on a blue background, and the image also appears to be upside down.  Murphy Decl. ¶¶ 12–13; Luca Decl. ¶ 4; First Ward Decl. ¶ 3(c).

9.    Unilever then engaged Polaris Corporate Risk Management LLC ("Polaris") to conduct an investigation.  First Ward Decl. ¶¶ 3–4.

10.    Starting on April 23, 2022, Polaris (1) conducted an in-person inspection of the First Location, and (2) researched any individuals who may be affiliated with the First Location ("Polaris Investigation").  First Ward Decl. ¶ 4.  The Polaris Investigation revealed the following:

    a.    The First Location is owned by 2026 Third Realty, LLC in the names of individuals Hae Hee Kim and Courtney Haejin Kim.  Both women reside at 152 Delaware Ave., Haworth, New Jersey 07641 ("New Jersey Address" or "Third Location").  *Id.* ¶ 5.

    b.    Mortgage documents list Ms. Hae Hee Kim as 2026 Third Avenue Realty, LLC's Managing Member and Ms. Courtney Haejin Kim as a Member.  *Id.* ¶ 7.

    c.    Two other individuals, Daniel Kim and Bryant Kim, are also associated with both the First Location and the New Jersey Address.  *Id.* ¶¶ 6–7.

11.    On April 23, 2022, a Polaris investigator visited the First Location but found that a metal gate had been pulled down over the entrance to the store, limiting visibility and access.  *Id.* ¶ 9.

12.    The investigator then approached several nearby residents.  *Id.* ¶ 10.  Those residents disclosed that the gate concealed numerous containers of Counterfeit Products which

they claimed to have observed when the gate was previously opened. *Id.* They further confirmed that the storefront had garnered interest from passersby, who would captured images of the Counterfeit Products.  *Id.*

13.     Because Mr. Murphy was denied entrance to the First Location (Murphy Decl. ¶¶ 11, 13) and the gate was closed when Unilever's investigator visited the First Location on April 23, 2022 (First Ward Decl. ¶ 10), Unilever was not able to secure a physical sample or take additional photographs of the Counterfeit Products at that time.  But Unilever believed there may have been additional differences, including the contents and quality of the products, which potentially posed serious health and safety threats to the public.  *See* Murphy Decl. ¶¶ 13–17; Luca Decl. ¶¶ 4–9.

14.     On April 25, 2022, pursuant to 15 U.S.C. § 1116(d)(2), Unilever's counsel first contacted the United States Attorney's Office for the Southern District of New York (the "Office") to notify the Office of the planned TRO Application.  Brennan Decl. ¶ 3.  On April 29, 2022, Unilever's counsel once again contacted the Office and spoke with Deputy Michael Gonzalez of the United States Marshals Service, to notify the Office that the TRO Application had been filed. *Id.* ¶ 4.

15.     On May 2, 2022, in accordance with the Original TRO, Unilever posted a $5,000 bond.

16.     On May 3, 2022, Unilever executed the seizure portion of the Original TRO at the three locations identified in the Original TRO: (i) the First Location; (ii) 1992 3rd Avenue, New York, New York 10029 (the "Second Location"), and (iii) the Third Location (collectively, the "May 3, 2022 Seizures").  At the First and Second Locations, Unilever was assisted by Mr. Ward of Polaris (as well as other Polaris team members) and the New York Police Department

("NYPD").  At the Third Location, Unilever was assisted by Mr. Martinez of Polaris (as well as another Polaris team member) and the Haworth, New Jersey Police Department ("Haworth Police").  Third Ward Decl. ¶ 4; Martinez Decl ¶ 4.

17.     When Polaris and NYPD were in the process of executing the seizure order included in the Original TRO at the First Location, an unidentified Black male ("Individual 1") approached Mr. Ward and asked him what he and the NYPD were looking for at the First Location.  Mr. Ward advised Individual 1 that they were gaining entry to search the First Location for pallets of Hellmann's-branded mayonnaise.  Individual 1 advised that he knew about the mayonnaise because it was his company that bought the mayonnaise.  Third Ward Decl. ¶ 5.

18.     Individual 1 subsequently led Mr. Ward inside the AMIS Discounted Furniture LLC ("AMIS Furniture") storefront located at 2020 Third Avenue, New York, New York 10035 ("Fourth Location"), only a few storefronts down from the First Location.  *Id.* ¶ 6.  Upon entering the Fourth Location, Individual 1 logged into a computer and showed Mr. Ward screens of a website and claimed that he had purchased the goods from that website.  With the permission of Individual 1, Mr. Ward took photographs of those screens.  Individual 1 advised that the mayonnaise was shipped to Gambia, Africa, approximately two weeks before May 3, 2022.  *Id.*

19.     Individual 1 also advised Mr. Ward that he shipped 17,280 units of Hellmann's mayonnaise, equivalent to roughly 24 pallets.  *Id.* ¶ 7.

20.     Also outside of the First Location, an unidentified Hispanic male ("Individual 2") approached Mr. Ward and advised that the mayonnaise was expired and that for several weeks, the owners of AMIS Furniture had a crew of three people working around the clock to affix fake

labels on the expired mayonnaise.  Individual 2 stated that the mayonnaise was removed from the First Location on May 2, 2022, contradicting Individual 1's claims that all the Counterfeit Products had been shipped several weeks before.  *Id.* ¶ 8.

21.     Among other things found inside the First Location were (i) garbage bags filled with removed Hellmann's mayonnaise labels, and (ii) several boxes from Vibrant Printing and Graphic Corp. ("Vibrant Printing"), located at 4015 White Plains Road, Bronx, New York 10466 ("Sixth Location").  *Id.* ¶¶ 9–10.  As later investigation and seizures have shown, Vibrant Printing created the counterfeit Hellmann's labels.  *Id.* ¶ 10; Fourth Ward Decl. ¶¶ 5–6.

22.     The identities of two individuals, Youssouf Diagouraga and Mustafa Ganchi, were discovered during the seizures at the First and Second Locations.  Third Ward Decl. ¶ 15. Documents seized at the First and Third Locations show that Mr. Diagouraga is affiliated with AMIS Furniture and has leased property from 2026 Third Avenue Realty, LLC, which is owned by Hae Hee Kim and Courtney Haejin Kim.  First Ward Decl. ¶ 5.  The initial investigations also show that Mr. Mustafa Ganchi is a proprietor of Vibrant Printing.  Third Ward Decl. ¶ 16; Fourth Ward Decl. ¶ 5.

23.     Documents and items obtained at the First and Third Locations reveal that AMIS Furniture may be affiliated with numerous storefronts close to the First Location, including (i) the Fourth Location; (ii) 2022 3rd Avenue, New York, New York 10029 ("Fifth Location"); and (iv) 2236 3rd Avenue, New York, New York 10029.  Third Ward Decl. ¶ 19.

24.     On May 4, 2022, Unilever's counsel once again contacted the Office and spoke with Deputy Gonzalez, informing him that with the assistance of Polaris, the NYPD, and the Haworth Police, Unilever executed the seizure order portion of the TRO on May 3, 2022, at the three locations identified in the TRO.  Supp. Brennan Decl. ¶ 5.  Further, Unilever's counsel

advised Deputy Gonzalez that the May 3, 2022 Seizures yielded information requiring the
emergency motion for an Amended TRO.  *Id.*

25.     Deputy Gonzalez advised Unilever's counsel that the U.S. Customs and Border
Protection ("CBP") division for the New York City metropolitan area runs out of Port Newark.
Deputy Gonzalez also confirmed that the overwhelming majority of New York City metropolitan
area shipping goes in and out of Port Newark.  Given the potentially hazardous export of expired
and counterfeit food products, Deputy Gonzalez stated that he would contact Port Newark CBP.
*Id.* ¶ 6.

26.     In addition to discussing the potential export of hazardous counterfeit mayonnaise
with Deputy Gonzalez, Unilever's counsel has been in contact with Joseph Sedlacek, CBP
Liaison Officer at Port Newark regarding the potential export of the Counterfeit Products.  *Id.*
¶ 7.

27.     After Unilever made an emergency motion for modification of the Original TRO,
the Court issued the First Amended TRO on May 6, 2022.

28.     On May 12, 2022, Unilever executed the seizure portion of the First Amended
TRO with the assistance of Polaris and NYPD at the following three locations: (i) the Fourth
Location; (ii) the Fifth Location; and (iii) the Sixth Location (collectively, the "May 12, 2022
Seizures").  Fourth Ward Decl. ¶ 4; Cannon Decl. ¶ 3.

29.     Mr. Cannon of Polaris executed the seizure order contained in the Amended TRO
at the Fourth and Fifth Locations.  Mr. Cannon first entered the storefront of the Fourth Location,
which was identified by an exterior awning labeled "AMI'S DISCOUNT FURNITURE."  Inside
the Fourth Location, he encountered an individual who claimed to be the AMIS Furniture
operator.  Mr. Cannon advised the individual that his team and the NYPD were gaining entry to

search the Fourth Location for information related to Hellmann's-branded mayonnaise and asked the individual for identification.  The individual identified himself as Lamin Humma.  Cannon Decl. ¶ 4.

30.     Upon request, Mr. Humma provided Mr. Cannon with his mobile phone and laptop and allowed the Polaris investigation team to search the premises for other devices and business records.  When asked if he could provide any information about the party or parties involved in exporting the Hellmann's-branded mayonnaise, Mr. Humma provided the mobile number of an individual named "Sarjo," who he claimed was responsible for shipping the mayonnaise to Gambia.  *Id.* ¶ 5.  Mr. Humma stated that he did not have any further information about "Sarjo's" identity or the mayonnaise. *Id.*

31.     After executing the seizure at the Fourth and Fifth Locations, Polaris investigated the owner of the phone number that Mr. Humma had provided and discovered that the number was affiliated with an individual named Sarjo Dambelly since at least September 16, 2010.  *Id.* ¶ 6.  The investigation also revealed that Mr. Dambelly is connected to an address in the Bronx. *Id.*

32.     While executing the seizure order contained in the Amended TRO at the Sixth Location, Mr. Ward spoke with two individuals present at the location, Mr. Mohamad Ganchi and Mr. Mustafa Ganchi of Vibrant Printing.  When asked about the fraudulent Hellmann's mayonnaise labels, the two men confirmed that they had printed around 17,500 counterfeit Hellmann's mayonnaise labels.  Fourth Ward Decl. ¶ 5.

33.     Mr. Mohamad Ganchi and Mr. Mustafa Ganchi claimed that they were contracted to print the labels by another entity, AMIS Furniture.  Mr. Mustafa Ganchi explained that before creating the fake labels, he visited AMIS Furniture where the mayonnaise was stored.  There, he

took measurements of the jars and removed some of the authentic labels for reference.  The men explained that they communicated with the buyer of the mayonnaise at AMIS Furniture via WhatsApp.  *Id.* ¶ 6.

34.     Although investigations still remain preliminary, it appears, upon information and belief, that:

a.     AMIS Furniture, Mr. Diagouraga, Mr. Humma, Mr. Dambelly, and/or affiliated entities and/or individuals purchased HELLMANN'S mayonnaise on a "close out" sale (*i.e.*, sale of products close to expiration date at a discount) in around January 2022.  Third Ward Decl. ¶ 17. These products had a March 14, 2022 "best if used by" date.

b.     After AMIS Furniture, Mr. Diagouraga, Mr. Humma, Mr. Dambelly, and/or affiliated entities and/or individuals procured Hellmann's products, they worked with Mr. Mustafa Ganchi, Mr. Mohamad Ganchi, and Vibrant Printing to make counterfeit labels to place on the Hellmann's products.  Fourth Ward Decl. ¶¶ 5–6.  The counterfeit labels include fake expiration dates.

c.     AMIS Furniture, Mr. Diagouraga, Mr. Humma, Mr. Dambelly, and/or affiliated entities and/or individuals used the First Location to manufacture, by placing the counterfeit labels on the now-expired Hellmann's products, and store the Counterfeit Products.  Second Ward Decl. ¶¶ 9–11.

d.     2026 Third Avenue Realty, LLC is the landlord of the First Location and leased the property to AMIS Furniture and Mr. Diagouraga at the time the

Counterfeit Products were manufactured and relabeled, stored, and when they garnered significant media coverage in around April 2022.  First Ward Decl. ¶¶ 5–7.

e.    After the expired products were relabeled, some of the Counterfeit Products were moved from the First Location on or about April 18, 2022, to Port Newark to be shipped to Gambia in Container No. TCNU2879790 on Maersk vessels.  Third Ward Decl. ¶ 18.

f.    Working with the CBP and Maersk, Unilever was able to divert Container No. TCNU2879790 back to the United States.  Container No. TCNU2879790 was scheduled to arrive back in New Jersey on or around June 3, 2022.  The CBP and Maersk are in the process of removing Container No. TCNU2879790 from the Maersk vessel and investigating its contents.

35.    Rule 65(b) of the Federal Rules of Civil Procedure authorizes courts to issue an *ex parte* TRO where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition.  Fed. R. Civ. P. 65(b).  The standard for granting a temporary TRO and a preliminary injunction are identical. *3M Co v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).   A party seeking to obtain either relief must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of an injunction; (3) that the balance of hardships favors the plaintiff; and (4) that the public interest will not be disserved if an injunction issues. *Id*.

16

36.     The Court finds that Unilever is likely to succeed on the merits of its claims.  The Lanham Act provides that a defendant is liable for trademark infringement and counterfeiting if a defendant, "without the consent of the registrant, uses in commerce any reproduction, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . which such use[s] is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).  Courts examine (1) whether the plaintiff's mark is entitled to protection, and (2) whether the defendant's use of the mark is likely to cause confusion.  *See, e.g.*, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016); *Spin Master Ltd., v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 420 (S.D.N.Y. 2018); *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 520 (S.D.N.Y. 2019).

37.     Unilever satisfies both prongs.  First, Unilever's HELLMANN'S Marks are registered with the PTO on the Principal Register, are valid and subsisting, and many are incontestable.  Murphy Decl. ¶ 6.  The registrations for the HELLMANN'S Marks are *prima facie* evidence of their validity and of Unilever's exclusive right to use the HELLMANN'S Marks under 15 U.S.C. § 1057(b).  From Unilever's longstanding use of the HELLMANN'S Marks and stringent quality control, the HELLMANN'S Marks signify to consumers that the genuine HELLMANN'S products are manufactured to the highest quality standards.  *Id.* ¶ 5. Second, Defendants are engaged in unauthorized use of the HELLMANN'S Marks on counterfeit labels affixed to expired products, and these unauthorized uses are likely to confuse and deceive the consuming public into thinking that Defendants' Counterfeit Products emanate from and/or authorized by Unilever.  *See Spin Master*, 325 F. Supp. 3d at 422 ("The sale of counterfeit goods is sufficient use to establish liability.").

38.     The same test is required to establish likelihood of success on the merits of

Unilever's unfair competition and false designation of origin claims.  *Id.* at 423.  To prove false

designation of origin and unfair competition under 15 U.S.C. § 1125(a), a plaintiff must show:

(1) that it has a valid and protectable trademark, and (2) a likelihood of confusion as to the

origin of the defendant's products. *Salvatore Ferragamo S.p.A. v. Does 1–56*, No. 18 Civ.

12096, 2020 WL 774237, at *2 (S.D.N.Y. Feb. 18, 2020).  For the same reasons as above in

connection with the trademark infringement and counterfeiting claims, a likelihood of success

on the merits also exists for the false designation of origin and unfair competition claims.

39.     A plaintiff who has shown a likelihood of success on the merits of a Lanham Act

claim has also satisfied the likelihood of success on the merits of an unfair competition claim

under New York common law so long as the plaintiff can show that the defendants acted in bad

faith.  *Id.* at *4.  Because Unilever has established a likelihood of success on the merits of its

trademark infringement and counterfeiting claim against Defendants, bad faith is presumed.  *Id.*

40.     Unilever has also shown a likelihood of success on the merits of its dilution

claims under both the Lanham Act and New York law.  Both recognize two categories of

dilution claims: dilution by blurring and dilution by tarnishment.  Dilution by blurring refers to

the "gradual diminishment of a famous mark's acquired ability to clearly and unmistakably

distinguish one source through unauthorized use."  *Coty Inc. v. Excell Brands, LLC*, 277 F.

Supp. 3d 425, 458 (S.D.N.Y. 2017).  A claim of dilution by tarnishment "arises when the

plaintiff's trademark is linked to products of shoddy quality or is portrayed in an unwholesome

or unsavory context likely to evoke unflattering thoughts about the owner's product."  *Id.* at

460 (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir. 1994)).  Federal

trademark dilution claims require a showing that "(1) the mark is famous; (2) defendant's use

of the mark is made in commerce; (3) the defendant used the mark after the mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *DigitALB, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (citation omitted).  The legal standard for New York trademark dilution claims is "essentially the same" as the Lanham Act dilution claims.  *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002).

41.     Unilever satisfies each prong of the dilution analysis.  First, the HELLMANN'S Marks are famous as shown by the fact that the counterfeit products caused media attention.  *See supra* ¶ 4.  Second, Defendants' distribution and/or sale of the Counterfeit Products constitutes commercial use.  Third, because Unilever and its predecessors have used the HELLMANN'S Marks in connection with mayonnaise and related food products in the United States for many decades (*see* Murphy Decl., ¶¶ 3–4), the HELLMANN'S Marks became famous before Defendants' unauthorized uses.  Fourth, Defendants' use of the HELLMANN'S Marks on the Counterfeit Products is likely to dilute Unilever's HELLMANN'S Marks by blurring and tarnishment.  *See Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781, 2009 WL 1675080, at *13–15 (S.D.N.Y. June 10, 2009) (holding that the use of counterfeit marks establishes dilution as a matter of law because "when identical marks are used on similar goods, dilution—the capacity of the famous mark to identify and distinguish the goods of the trademark holder— obviously occur") (internal citation omitted).

42.     Moreover, a landlord may be held liable for contributory trademark infringement when it "knew or had reason to know" that individuals were selling counterfeit goods.  *Omega SA v. 375 Canal, LLC,* 984 F.3d 244, 254 (2d Cir. 2021).  Willful blindness cannot absolve a party from contributory trademark infringement liability.  *Id*.

43.     The Court finds that Defendants' alleged distribution and sale of the Counterfeit Products poses a substantial risk of harm to the health and safety of consumers and creates a false association between these products and Unilever.

44.     Unilever has also established that because the Counterfeit Products are visually indistinguishable from Genuine HELLMANN'S Products to ordinary consumers (*see* Murphy Decl. ¶¶ 7–9; Luca Decl. ¶ 4; Ward Decl. ¶ 3), Defendants' sale and distribution of the Counterfeit Products will lead to a loss of control over the HELLMANN'S Marks and damage the goodwill that Unilever has developed in its HELLMANN'S brand, causing Unilever immediate and irreparable harm.  *See Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*, 924 F. Supp. 17, 21 (S.D.N.Y. 1996).

45.     Considering the nature of Defendants' counterfeiting businesses, and Unilever's showing that it has a high likelihood of succeeding on the merits of all of its claims, Unilever will be entitled to at least an equitable accounting of Defendants' profits from their sales of Counterfeit Products and/or statutory damages.

## **ORDER**

Based on the foregoing findings of fact and conclusions of law, the injunctive relief previously granted in the Original TRO, First Amended TRO, and Second Amended TRO shall remain in place through the pendency of this litigation, and issuing this Preliminary Injunction Order (hereinafter "PI Order") is warranted under Federal Rule of Civil Procedure 65 and the Lanham Act.  Unilever's preliminary injunction application is hereby GRANTED as follows:

**IT IS HEREBY ORDERED THAT**, Defendants Youssouf Diagouraga, Mustufa Ganchi, Amis Discounted Furniture, LLC, Vibrant Printing and Graphic Corp., Mohamad Ganchi, Lamin Humma, and Sarjo Dambelly (the "PI Defendants"), their affiliates,

subsidiaries, parents, and their respective officers, agents, servants, attorneys, and employees, and all persons and entities in active concert or participation with them are hereby immediately **PRELIMINARILY ENJOINED** from:

1.      Using any of the HELLMANN'S Marks, in connection with the manufacture, sale, offer for sale, distribution, or advertisement of any products;

2.      Committing any acts calculated to cause purchasers to believe that Counterfeit Products are sold under the control or supervision of Unilever, when they are not;

3.      Selling, passing off, inducing, or enabling others to sell or pass off any products— including without limitation HELLMANN'S mayonnaise—as Unilever goods or as produced by or for Unilever, which are not Unilever's genuine goods, or are not sold under the control or supervision of Unilever;

4.      Directly or indirectly manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling Counterfeit Products, or any counterfeit or infringing packaging for the same;

5.      Using any reproduction, counterfeit, copy, or colorable imitation of any of the HELLMANN'S Marks in connection with the publicity, promotion, sale, or advertising of any products;

6.      Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as Unilever goods and from offering such goods in commerce;

7.      Diluting any of the HELLMANN'S Marks;

8.     Destroying and/or failing to preserve any records related to the manufacture, advertising, receipt, importation, shipment, purchase, sale, offer for sale, or distribution of any products using any of the HELLMANN'S Marks; and

9.     Assisting, inducing, enabling, aiding, or abetting any other person or business entity engaging in or performing any of the activities referred in subparagraphs 1–8 above.

**IT IS FURTHER ORDERED THAT**, during the pendency of this PI Order, Unilever shall be authorized to inspect any products exported, marketed, offered, or sold by the PI Defendants that bear the HELLMANN'S Marks for the purpose of determining whether they are genuine or counterfeit or infringing, and thus to confirm whether Defendants are complying with this PI Order.

**IT IS FURTHER ORDERED THAT**, upon written notice to the Court and Unilever's counsel, any PI Defendant or affected third party may, upon proper showing, appear and move for dissolution or modification of the provisions of this PI Order.

**IT IS FURTHER ORDERED THAT**, all electronic data, including, but not limited to, emails, chats, texts, phone records, video security footage, invoices, bills of lading, and accounting software shall be preserved pending further order of this Court.

**IT IS FURTHER ORDERED THAT**, pending the final disposition of all claims in this action, all PI Defendants shall preserve all documents, electronically-stored information, and/or tangible things that may be relevant to the subject matter of, or reasonably calculated to lead to the discovery of admissible evidence in, this action or any of the claims asserted herein, and maintain them in an accessible form and place.

**IT IS FURTHER ORDERED THAT**, under Rules 26, 30, and 34 of the Federal Rules of Civil Procedure, Unilever shall be entitled to conduct expedited discovery from all the PI Defendants as follows:

1. Unilever may serve interrogatories pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure as well as Local Civil Rule 33.3 of the Local Rules for the Southern and Eastern Districts of New York, and the PI Defendants who are served with this order shall provide written responses under oath to such interrogatories within fourteen (14) days of service to Unilever's counsel;

2. Unilever may serve requests for the production of documents pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and the PI Defendants who are served with this order and the requests for the production of documents shall produce all documents responsive to such requests within fourteen (14) days of service to Unilever's counsel;

3. Service of such discovery requests on the PI Defendants shall be deemed good and sufficient if made personally, by process service, or upon counsel, should counsel appear for any of the PI Defendants in this action; and

4. All PI Defendants shall additionally provide witnesses for deposition, pursuant to Rule 30 of the Federal Rules of Civil Procedure, not later than ten (10) days after Unilever serves them with notices of deposition for such witnesses' testimony. Service of such deposition notices on the PI Defendants shall be deemed good and sufficient if made personally, by process service, or through counsel, should counsel appear for the PI Defendants in this action.

Defendants Daniel Kim, Hae Hee Kim,  Courtney Kim, 2026 Third Realty LLC, and K&K Footwear shall file any opposition to the entry of a preliminary injunction order against them by **June 24, 2022**.  Plaintiff shall serve all Defendants with a copy of this order through personal service or process service by **June 13, 2022**, and shall file proof of service on the docket by **June 16, 2022.**

SO ORDERED.

Dated: June 8, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge